[Criminal No. 913. Filed February 9, 1942.]

[121 Pac. (2d) 882.]

## THE STATE OF ARIZONA, Appellee, v. FRANK PASS, Appellant.

Mr. Joe Conway, Attorney General, and Mr. Albert M. Garcia, Assistant Attorney General; Mr. Richard F. Harless, County Attorney and Mr. James H. Garcia, Deputy County Attorney, for Appellee.

Mr. Albert D. Leyhe, for Appellant.

ROSS, J.—The defendant, Frank Pass, who was tried for the murder of Sai Han Ong, alleged in the information to have been committed by him on February 10, 1940, and found guilty of the second degree of that crime, has appealed.

The principal witness against him was Ruby Contreras Pass. Without her testimony it is clear there could have been no conviction. When she was offered by the state as a witness, defendant promptly objected on the ground that she was his wife and disqualified by statute to testify against him except with his consent. Subd. 3, sec. 23–103, Arizona Code 1939. The court overruled defendant's objection, holding that defendant and Ruby Contreras were not husband and wife "upon the ground . . . that a descendant of an Indian may not marry a member of the Caucasian race."

Defendant and Ruby Contreras had been living together for some time and on January 20, 1940, they obtained a license and went through the marriage ceremony.

The evidence is undisputed that defendant's mother was the child of an English father and a Piute Indian woman and that his father was a Mexican, so he was a descendant of three races, to-wit, Caucasian, Indian and Mexican.

Ruby Contreras Pass testified that her father was a Spaniard and her mother half French and half Mexican. And to the question "Do you have any Indian blood in you?" she answered, "Not that I know of." Thus she is a descendant of two races, to-wit, Spanish and French.

The Arizona statute against miscegenation, as amended in 1931, chapter 17, section 1, is section 63–107, Arizona Code 1939, and reads, so far as material:

"63-107. *Prohibited and void marriages.*—The marriage of persons of Caucasian blood, or their descendants, with Negroes, Hindus, Mongolians, members of the Malay race, or Indians, and their descendants, shall be null and void. . . . "

According to Bouvier's Law Dictionary, "descendants" are "Those who have issued from an individual, including his children, grandchildren, and their children to the remotest degree." 1 Bouv. Law Dict., Rawle's 3d Rev., p. 852.

This statute is peculiar, we think, to Arizona. We have been unable to find its like in the laws of any other state of the Union. In the early history of the Territory of Arizona the miscegenation statute read:

"(1893). Sec. 3. All marriages of white persons with negroes, mulattoes, indians or mongolians are declared illegal and void." Comp. Laws 1877, Chap. XXX.

In *Estate of Walker,* 5 Ariz. 70, 46 Pac. 67, this court held that a marriage between a white person and an Indian was null and void. There was no question but that the diversity of race was present. Walker was a white person and the woman he married was a full-blood Pima Indian. No inquiry into that question was necessary. The holding, in effect, was that the territorial legislature was competent to enact laws regulating the marriage of persons within its jurisdiction and that its prohibition against the interbreeding of the white race and the Indian race was valid.

In *Kirby* v. *Kirby,* 24 Ariz. 9, 206 Pac. 405, 406, the plaintiff, a white man or Caucasian, brought an action to annul his marriage to a negress on the ground that such marriage was void. The statute at that time read:

"All marriages of persons of Caucasian blood, or their descendants, with negroes, Monogolians or In-

dians, and their descendants, shall be null and void."
Par. 3837, Rev. Stat. Ariz. 1913, Civ. Code.

This statute is the same as the present statute except the latter includes two additional races as incompetent to contract marriage with Caucasians and their descendants. In the Kirby case the constitutionality of the law was questioned on three grounds, as follows:

"(1) In that it discriminates against descendants of persons of Caucasian blood in forbidding them to marry persons belonging to either of the other races or their descendants, while persons of mixed blood, other than Caucasian, may marry any person who is not Caucasian; (2) in that persons of mixed Caucasian blood cannot marry any person or lawfully contract any marriage in this state; and (3) the legislature is without power to prohibit persons of mixed Caucasian blood from contracting marriage in this state."

We held that the defendant could not raise the question of constitutionality "for the reason that there is no evidence that she is other than of the black race. In other words, it is not shown that defendant is a decendant of the Caucasian race."

In *Re Monk's Estate*, 48 Cal. App. (2d) 603, 120 Pac. (2d) 167, 173, it appears that during his lifetime Monk went with Antoinette Giraudo from San Diego, California, to Yuma, Arizona, there obtained a marriage license and went through the ceremony of marriage. The court found that she was seven-eighths Caucasian and one-eighth Negro blood and therefore fell within the ban of the Arizona statute. She claimed that the law was repugnant to the Fourteenth Amendment to the Constitution of the United States, in that it deprived her and others in her racial classification of liberty to contract marriage. The court said:

" . . . Her assertion is interesting but in our opinion not tenable for the reason that appellant is limited in her attack on the statute to the factual situation presented. If she, as a person found to be a hybrid, were facing a contention that her marriage to another of the same mixed blood was invalid, then it is obvious that the constitutional problem would be squarely presented. But she is not so situated. Her purported marriage was with a person found to be of unmixed Caucasian blood. This is the fair interpretation of the findings. Many states have statutes prohibiting such alliances, and we have had presented no instance of successful constitutional attacks upon them or any of them. It is true that the Arizona provision differs somewhat in form from the miscegenetic legislation of other states in that in lieu of the phrase 'persons of Caucasian blood, or their descendants,' most jurisdictions use the words 'white,' 'white person,' or 'person not of African descent' as describing the one prohibited party and thus avoid the mixed blood difficulty arising from a consideration of the status of one who traces ancestry to both Caucasian and Negro forbears."

Defendant's purported marriage was with a person of unmixed Caucasian blood. Ruby Contreras' father was a Spaniard and her mother was a Mexican of Spanish and French descent. In her veins nothing but Caucasian blood flowed. The hypothetical situation involving an attempted alliance between two persons of mixed blood is not present and we are well satisfied that the law, in so far as it forbids a white person to marry an Indian or his descendants, is constitutional. Indeed, all the courts, we believe, hold that. If the marriage had been one between persons of mixed Caucasian and Indian blood, then the constitutionality of the law might have been raised by either. *Kirby* v. *Kirby, supra,* and *In re Monk's Estate.*

The evident purpose of the miscegenation statute was to prevent the named races, to-wit, In-

dians, Negroes, etc., from mixing their blood with the blood of the white man and such purpose is lawful. *Kirby* v. *Kirby, supra.* Section 63–107, *supra,* goes farther than that. It makes a marriage of a person of Caucasian blood and his descendants to one of Indian blood and his descendants null and void. Under it a descendant of mixed blood such as defendant cannot marry a Caucasian or a part Caucasian, for the reason that he is part Indian. He cannot marry an Indian or a part Indian because he is part Caucasian. For the same reason a descendant of mixed Negro and Caucasian blood ·may not contract marriage with a Negro or a part Negro, etc. We think the language used by the lawmakers went far beyond what was intended. In trying to prevent the white race from interbreeding with Indians, Negroes, Mongolians, etc., it has made it unlawful for a person with 99 per cent. Indian blood and 1 per cent. Caucasian blood to marry an Indian, or a person with 99 per cent. Caucasian blood and 1 per cent. Indian blood to marry a Caucasian. We mention this and the absurd situations it creates believing and hoping that the legislature will correct it by naming the percentage of Indian and other tabooed blood that will invalidate a marriage. The miscegenation statutes of the different states do fix the degree or percentage of blood in a Negro, an Indian, etc., preventing marriage alliances with Caucasians.

 It is argued by counsel for defendant that the invalidity of the marriage of defendant and Ruby Contreras could be established only in an action for annulment and that the court erred in permitting the introduction of evidence thereof in this collateral proceeding. The statute makes a marriage between a. Caucasian and a person of certain named races and their descendants null and void. In *Estate of Walker,*

*supra* [5 Ariz. 70, 46 Pac. 69], it was said that such a union is "null and void, and no decree would be necessary to annul it." Such a union is not only voidable but null and void and may be shown in any proceeding when material. 35 Am. Jur. 269, sec. 146, and notes 17 and 18; *State* v. *Yoder,* 113 Minn. 503, 130 N. W. 10, L. R. A. 1916C 686; *People* v. *Glab,* 13 Cal. App. (2d) 528, 57 Pac. (2d) 588.

We have considered all of the assignments and in the foregoing opinion have covered those that have any merit.

The judgment of the lower court is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.